IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**LUTHER LEWIS**                                                                              **PLAINTIFF**

**v.**                                   **Case No: 4:20-cv-00366-KGB**

**MICHAEL T. JONES, Officer,**
**Conway Police Department,** *et al.*                                      **DEFENDANTS**

## OPINION AND ORDER

Plaintiff Luther Lewis filed a *pro se* complaint against Officer Michael T. Jones, Sergeant Raymond Mudgett, Officer Danny L. Worley, Officer Andrew Jo Foreman, and Sergeant Andrew Burningham, each in their individual and official capacities, and Don Newton in his official capacity only (collectively "defendants") (Dkt. Nos. 2, 3, 33, 72).  Mr. Lewis asserts an excessive force claim against Officers Jones, Worley, Foreman, and Newton resulting from his arrest on April 1, 2020 (*Id.*).  Additionally, Mr. Lewis asserts that Officers Foreman and Newton, and Sergeants Burningham and Mudgett, were present at various times during the events leading up to his arrest and failed to intervene (*Id.*).  Mr. Lewis also raises an unidentified official capacity claim against all of the defendants (*Id.*).  Before the Court are the motion for summary judgment and motion to strike of the defendants (Dkt. Nos. 76, 84).  Mr. Lewis has responded in opposition to defendants' motion for summary judgment and motion to strike (Dkt. Nos. 80, 88).  Defendants replied to Mr. Lewis's response to the motion for summary judgment (Dkt. No. 81).  Mr. Lewis filed a motion to withdraw voluntarily his official capacity claims against all defendants, motion to correct defendants' brief supporting their motion for summary judgment, and a motion seeking permission of Court to amend the complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure (Dkt. Nos. 91, 92, 95).  Defendants responded to Mr. Lewis's motion to withdraw official capacity claims, motion to correct defendants' brief in support, and motion to amend

complaint (Dkt. Nos. 93, 94, 96).   Mr. Lewis filed an objection to defendants' response to his motion to correct defendants' brief in support (Dkt. No. 97).

For the following reasons, the Court grants Mr. Lewis's motion to withdraw voluntarily his official capacity claims against all defendants and denies as moot defendants' motion to strike (Dkt. Nos. 84, 91).  The Court also denies Mr. Lewis's motion to correct defendants' brief, grants defendants' motion for summary judgment, and denies Mr. Lewis's motion seeking the permission of the Court to amend the complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure (Dkt. Nos. 76, 92, 95).

## I.    Factual Background

Defendants filed a statement of undisputed material facts in support of their motion for summary judgment (Dkt. No. 78).  Mr. Lewis has not responded to the statement of undisputed material facts in a separate pleading but does assert some facts in his response to the motion for summary judgment and response to the motion to strike (Dkt. Nos. 83, 88).  The following facts are taken from the parties' filings as noted herein.  In reaching a determination on the pending motion for summary judgment, the Court has reviewed the record evidence in the light most favorable to Mr. Lewis, as the Court is required to do at this stage.

### A.    The 911 Calls

On August 22, 2018, Officers Foreman and Newton of the Conway Police Department responded to a disturbance at 1125 Gum Street in Conway, Arkansas, around 11:48 p.m., which was initiated by a 911 call placed by Lavonta Rosbia (Dkt. No. 78, ¶ 1).  Dispatch informed Officers Foreman and Newton that Mr. Rosbia struck Mr. Lewis's car, and there had been a physical altercation between Mr. Rosbia and Mr. Lewis regarding the damaged vehicles (*Id.*, ¶ 2).

When Officers Foreman and Newton arrived on the scene and contacted Mr. Rosbia, Mr. Rosbia informed the officers that Mr. Lewis got extremely irate, and Mr. Lewis hit Mr. Rosbia in the chin (*Id.,* ¶ 3).  Mr. Rosbia informed the officers that Mr. Lewis tried to take Mr. Rosbia to the ground but was unsuccessful (*Id.*).  Mr. Rosbia told Officers Foreman and Newton that Mr. Lewis then broke both of Mr. Rosbia's car mirrors before driving away (*Id.*).  Mr. Rosbia informed the officers that Mr. Lewis had left the scene in a black two-door Honda (*Id.*, ¶ 4).

Dispatch advised Officer Foreman that Mr. Lewis called 911 to report that a friend stole his car and was involved in an accident (*Id.*, ¶ 5).  Dispatch advised Officer Foreman that Mr. Lewis was located at 329 Locust Street in Conway, Arkansas (*Id.*, ¶ 6).  Officers Foreman and Newton left Gum Street and proceeded to Mr. Lewis's last known location at Locust Street (*Id.*, ¶ 7).  While enroute to Locust Street, dispatch informed Officer Foreman and Officer Newton that Mr. Lewis's mother, Ella Ware, stated that Mr. Lewis was irate, and Mr. Lewis left 329 Locust Street to return to Willow Street to confront Mr. Rosbia (*Id.*, ¶ 8).

### B.     The Initial Stop

Officer Foreman observed a black, two-door vehicle pass by on Oak Street after he investigated and determined another black, two-door vehicle was not Mr. Lewis's car (*Id.*, ¶ 9).  Officer Foreman followed the car to a stop sign at Neal Street and Merriman Street (*Id.*, ¶ 10).  Officer Foreman exited the vehicle and approached Mr. Lewis (*Id.*, ¶ 11).

Mr. Lewis immediately became irate and interruptive with Officer Foreman's efforts to conduct his initial investigation during the stop (*Id.*, ¶ 11).  Officer Foreman directed Mr. Lewis to get out of his car, but Mr. Lewis refused (*Id.*, ¶ 12).  Officer Foreman grabbed Mr. Lewis's left arm in an effort to get him out of his vehicle, but Mr. Lewis refused to cooperate (*Id.*, ¶ 13).  Officer Newton drew his taser in an effort to get Mr. Lewis to comply with Officer Foreman's commands

(*Id.*, ¶ 14).  Officer Newton instructed Mr. Lewis to exit his car (*Id.* ¶ 15).  Officer Foreman then deescalated the situation by telling Mr. Lewis that Mr. Rosbia would pay to have Mr. Lewis's car repaired, and Officer Foreman removed his hand from Mr. Lewis's arm (*Id.*, ¶ 16).

Officer Foreman asked Mr. Lewis for his identification, and Mr. Lewis provided it (*Id.*, ¶ 17).  Mr. Lewis began reaching around in his vehicle after providing his identification, so Officer Newton approached the passenger side of Mr. Lewis's car and opened the car door to see for what Mr. Lewis was reaching (*Id.*, ¶ 18).

Officer Foreman smelled a slight odor of intoxicants coming from Mr. Lewis's vehicle (*Id.*, ¶ 19).  Officer Foreman asked Mr. Lewis if he had been drinking, and Mr. Lewis said, "no." (*Id.*, ¶ 20).

Mr. Lewis testified at his deposition that, on the day of the incident, he had "probably smoked . . . a blunt that morning or whatever," and probably consumed a twelve pack of sixteen-ounce cans of beer (*Id.*, ¶ 21).

Officer Foreman informed Mr. Lewis that he wanted to conduct some field sobriety tests to ensure that Mr. Lewis was safe to drive, but Mr. Lewis refused to cooperate and undergo the tests.  Mr. Lewis does not remember Officer Foreman asking him to undergo the tests (*Id.*, ¶ 22).

Officer Foreman informed Mr. Lewis that he was detained because Officer Foreman was conducting an investigation, and Mr. Lewis again became irate (*Id.*, ¶ 23).  While being detained, Mr. Lewis got out of his vehicle and walked away from Officers Foreman and Newton towards the west side of Neal Street (*Id.*, ¶ 24).  Although detained, Mr. Lewis continued to cross the north side of Merriman Street (*Id.*, ¶ 25).

### C.    Arrest And Use Of Force

A red sport utility vehicle ("SUV") approached Mr. Lewis and the officers, and the SUV stopped on the north side of the intersection of Neal Street and Merriman Street (*Id*., ¶ 26).  John Ware, Courtney Ware, and Ella Ware, later identified as Mr. Lewis's family members, exited the vehicle (*Id*.).  Mr. Lewis attempted to get into the back seat of the red SUV, and when his family protested, Mr. Lewis got out of the vehicle and walked around the scene (*Id*., ¶ 28).  Officer Foreman attempted to deescalate the situation again, but Mr. Lewis would not calm down and continued yelling profanity (*Id*., ¶ 29).  Mr. Lewis's mother, Ella Ware, told officers that Mr. Lewis had been drinking earlier in the evening (*Id*., ¶ 30).

Officer Foreman ordered Mr. Lewis to calm down and informed Mr. Lewis that, if he did not comply, he would be arrested (*Id*., ¶ 31).  Mr. Lewis still refused to calm down and refused to quit yelling profanity, so Officer Foreman informed Mr. Lewis that he was under arrest for disorderly conduct (*Id*., ¶ 32).

Officer Foreman commanded Mr. Lewis to put his hands behind his back, but Mr. Lewis refused to comply with Officer Foreman's instructions (*Id*., ¶ 33).  Officers Foreman and Newton then took Mr. Lewis to the ground to gain better control over him (*Id*., ¶ 34).

Officer Newton told Mr. Lewis repeatedly to stop resisting, but Mr. Lewis did not comply (*Id*., ¶ 35).  Officer Foreman ordered Mr. Lewis to place his hands behind his back (*Id*., ¶ 36).  Mr. Lewis continuously refused to comply with the officers' commands to stop resisting arrest and place his hands behind his back (*Id*., ¶ 37).

Officer Newton held Mr. Lewis on the ground while Officer Foreman attempted to place Mr. Lewis in handcuffs (*Id*., ¶ 38).

Mr. Lewis asserts that, during the handcuffing process, Officer Newton had his elbow on the back of his neck, his right forearm on the left side of his face, his head was pinned down, and his face was embedded in gravel (Dkt. No. 80, at 4, ¶ 3).

Mr. Lewis continued to resist and refused to give the officers his hands to be handcuffed (Dkt. No. 78, ¶ 39).  After struggling to overcome Mr. Lewis's resistance, Officer Foreman was finally able to place the handcuffs on Mr. Lewis with Officer Newton's assistance (*Id.*, ¶ 40).

Despite being handcuffed, Mr. Lewis continued resisting, and Officer Newton radioed for more officers to arrive on scene to assist with placing Mr. Lewis in the patrol vehicle (*Id.*, ¶ 41). Officers Foreman and Newton attempted to assist Mr. Lewis to his feet, but Mr. Lewis refused to stand to support his own weight (*Id.*, ¶ 42).  Officers Foreman and Newton assisted Mr. Lewis to the red SUV, where they placed Mr. Lewis on the hood of the SUV to prevent him from falling (*Id.*, ¶ 43).

Officers Worley, Robertson, and Jones arrived on the scene to assist Officers Forman and Newton (*Id.*, ¶ 44).[1]  Officer Jones moved his patrol vehicle closer to Mr. Lewis to make it easier to get him into the patrol vehicle (*Id.*, ¶ 45).

Based on previous law enforcement interactions with Mr. Lewis, Officer Jones knew that Mr. Lewis is passively resistant to lawful orders until he is handcuffed.  Then, once he is handcuffed, Mr. Lewis becomes actively resistant to officers' attempts to bring him into custody and under control (*Id.*, ¶ 46).

Officer Worley asked Officers Newton and Foreman if they were okay (*Id.*, ¶ 47).  Officer Worley asked Mr. Lewis's family if they were okay (*Id.*).  It was around this time that Officer Worley noticed that Mr. Lewis had several minor abrasions on his body and was bleeding from

---

[1]  Officer Robertson is not a defendant in this lawsuit (Dkt. Nos. 2, 3, 33, 72).

the mouth, but Mr. Lewis was not complaining about any injuries or requesting medical attention (*Id.*, ¶ 48).  Mr. Lewis's male family member, Mr. Ware, stated "[w]e're alright, we're just trying to tell him to chill out man." (*Id.*, ¶ 49).

Officers instructed Mr. Lewis to stand up.  Instead, Mr. Lewis went limp and hooked his legs around Officer Foreman's leg to prevent Officer Foreman from walking to place Mr. Lewis in the patrol vehicle (*Id.*, ¶ 50).  Mr. Lewis's family members yelled at Mr. Lewis to "get in the car." (*Id.*, ¶ 51).  Mr. Ware stated, "[t]hat's ridiculous man," while Mr. Lewis continued to resist officers' attempts at placing him in Officer Jones's patrol vehicle (*Id.*, ¶ 52).  Officers instructed Mr. Lewis to get into the patrol vehicle several times, but Mr. Lewis did not comply (*Id.*, ¶ 53).  One of Mr. Lewis's female family members yelled, "Luther get in the car!" while officers attempted to pick Mr. Lewis up and place him in the patrol vehicle (*Id.*, ¶ 54).  Mr. Ware told Mr. Lewis again to get in the car (*Id.*, ¶ 55).  One of Mr. Lewis's female family members yelled at Mr. Lewis, "[g]et in the car, boy!" (*Id.*, ¶ 56).

While officers were trying to get Mr. Lewis into the patrol vehicle, Mr. Lewis attempted to hook his feet around the door to prevent officers from placing him inside the vehicle (*Id.*, ¶ 57).  Officers Worley, Jones, and Robertson assisted Officers Foreman and Newton in placing Mr. Lewis in the back of Officer Jones's patrol vehicle (*Id.*, ¶ 58).

Sergeant Burningham arrived on the scene while the other officers attempted to get Mr. Lewis into Officer Jones's patrol vehicle (*Id.*, ¶ 59).  Sergeant Burningham approached Officer Jones's patrol vehicle to assist the other officers in getting Mr. Lewis into the patrol vehicle (*Id.*, ¶ 60).  Sergeant Burningham took Officer Foreman's position in the vehicle after instructing Officer Foreman to remove some items that were obstructing a path for Mr. Lewis to get in the

vehicle easily (*Id*., ¶ 61).  Mr. Lewis continued resisting the officers' attempts to get him into the patrol vehicle (*Id*., ¶ 62).

Sergeant Mudgett suffered an injury to his head during the altercation.  Sergeant Mudgett discovered some pain and an abrasion on the front of his scalp above his forehead (*Id*., ¶ 63). Sergeant Burningham sustained an injury to his left cheek while assisting officers with taking Mr. Lewis into custody (*Id*., ¶ 64).

Mr. Lewis testified at his deposition that he did not spit blood at the officers.  However, Officers Jones and Worley received blood spots on themselves and their uniforms during their attempts to place Mr. Lewis in the patrol vehicle (*Id*., ¶ 65).

Mr. Lewis acknowledges that, before he was tased, he was handcuffed in Officer Jones's patrol vehicle with "his feet hanging out" toward Officers Jones and Worley (*Id*., ¶ 66).  Officer Foreman was attempting to pull Mr. Lewis into the patrol vehicle from the driver's side and had ahold of Mr. Lewis's left arm when he stopped to let Officer Burningham move a bucket out of the way (Dkt. Nos. 76-1, at 6, Ex. 8, at 1:09-1:14, Dkt. No. 80, at 7, ¶ 1).  With his taser placed on Mr. Lewis's ribcage in drive-stun mode, Officer Worley ordered Mr. Lewis to get in the car three consecutive times, but Mr. Lewis refused (Dkt. No. 78, ¶ 67).  After Mr. Lewis refused Officer Worley's successive, lawful commands, Officer Worley deployed his taser once in drive-stun mode in an effort to get the situation under control and to get compliance from Mr. Lewis as commanded (*Id*., ¶ 68).

Officer Worley again ordered Mr. Lewis to get into the vehicle after tasing Mr. Lewis once in drive-stun mode, but Mr. Lewis refused (*Id*., ¶ 69).  According to Officer Jones, Mr. Lewis, who is known by Officer Jones to be very flexible, shifted his weight to his left side and grabbed at Officer Worley's taser (*Id*., ¶ 70).  At this point, Officer Worley's taser was still on.  Officer

Worley saw Mr. Lewis's finger was near the trigger guard of the taser, and Officer Worley feared that Mr. Lewis, or even he, would accidentally deploy a cartridge that would strike one of the officers (*Id.*, ¶ 71).

Once Officer Jones saw that Mr. Lewis grabbed Officer Worley's taser, to protect himself and potentially other officers, Officer Jones began striking Mr. Lewis in his shoulder and chest with a closed fist to make Mr. Lewis release the activated taser (*Id.*, ¶ 72). Mr. Lewis states that the body cam footage will show that Officer Worley had full control of his taser (Dkt. No. 83, at 3). The body cam footage does not, however, clearly show that Officer Worley had full control of his taser throughout this incident. Mr. Lewis testified that Officer Jones struck him in the face and ribs (*Id.*). Officer Jones and Officer Worley knew that if Mr. Lewis would have gained full control over the taser, Mr. Lewis could have used it against one of them (Dkt. No. 78, ¶ 72). The taser still had two cartridges, or four prongs, meaning the taser could be deployed twice (*Id.*). The only area available to receive the prongs on Officer Jones's body was from his naval up to his head (*Id.*).

Officer Worley was finally able to turn off the taser, remove the taser from Mr. Lewis's grasp, and move away from Mr. Lewis's reach (*Id.*, ¶ 73). Officer Jones immediately stopped hitting Mr. Lewis once Mr. Lewis no longer had ahold of Officer Worley's taser (*Id.*, ¶ 74).

Officers Burningham and Foreman heard a taser deploy, and then they saw Officer Jones strike Mr. Lewis several times and then stop (*Id.*, ¶ 75). Officers Burningham and Foreman did not know that Officer Jones was about to strike Mr. Lewis (*Id.*). Officers Burningham and Foreman did not see what happened that led to Officer Jones striking Mr. Lewis or what changed for Officer Jones to stop striking Mr. Lewis (*Id.*). After the incident, Officers Burningham and

Foreman learned that Mr. Lewis had grabbed Officer Worley's taser after it was deployed in drive-stun mode, and Officer Jones struck Mr. Lewis until the taser was surrendered (*Id.*).

Sergeant Mudgett heard an activated taser, but he did not see the taser being deployed or who deployed it (*Id.*, ¶ 76). Sergeant Mudgett stood behind officers who were crowded in the patrol vehicle doorway attempting to get Mr. Lewis fully into the vehicle, so he did not see Officer Jones strike Mr. Lewis or what led to Officer Jones striking Mr. Lewis (*Id.*). After the incident, Sergeant Mudgett learned that Officer Jones began striking Mr. Lewis to get Mr. Lewis to release his hold on Officer Worley's taser (*Id.*).

Officer Newton heard the deployment of the taser (*Id.*, ¶ 77). Mr. Lewis's family began getting upset, and Officer Newton moved away from Officer Jones's vehicle to tell the family to calm down (*Id.*). At that point, Officer Newton did not observe what was happening in Officer Jones's vehicle, and he never observed Officer Jones strike Mr. Lewis (*Id.*).

Once Mr. Lewis no longer had ahold of the taser, Officer Jones put Mr. Lewis's legs in the patrol vehicle and shut the door (*Id.*, ¶ 78). Mr. Lewis then pushed himself through the open door on the driver's side of the patrol vehicle and fell to the ground (*Id.*, ¶ 79).

Sergeant Burningham attempted to deescalate the situation by telling Mr. Lewis that, if he would "sit in the car," Sergeant Burningham would "listen to everything he had to say." (*Id.*, ¶ 80).

While officers attempted to get Mr. Lewis in the patrol vehicle, Mr. Lewis locked his feet around the top of the doorway of the patrol vehicle to prevent officers from placing him inside the vehicle (*Id.*, ¶ 81). Officer Worley stated to the others attempting to get Mr. Lewis in the vehicle to "watch his legs" and to "watch his neck." (*Id.*, ¶ 82). Officers ordered Mr. Lewis to put his legs in the patrol vehicle, but Mr. Lewis refused to comply (*Id.*, ¶ 83). When officers were almost able to shut the door, Officer Worley again told officers to "watch his leg." (*Id.*, ¶ 84). Officers were

finally able to get the door shut on the driver's side of the vehicle after getting Mr. Lewis's legs in the patrol vehicle (*Id.*, ¶ 85).

Although Mr. Lewis was fully in the vehicle, Mr. Lewis laid in the floorboard, so Officer Worley and the other officers went to the other side of the vehicle to put Mr. Lewis in the seat (*Id.*, ¶ 86). Mr. Lewis refused to get into the seat, so Officer Jones requested other officers to help pull Mr. Lewis out of the floorboard and into a seat (*Id.*, ¶ 87). Throughout the entire encounter, Mr. Lewis never complied with any of the commands given by the officers, and he used every available means to resist officers' attempts to place him properly in the patrol vehicle (*Id.*, ¶ 88).

Once Mr. Lewis was in the seat in the patrol vehicle, Officer Worley called dispatch requesting paramedics to arrive on scene to treat Mr. Lewis's minor injuries (*Id.*, ¶ 89). Officer Worley told dispatch that Mr. Lewis had injuries and had "been spitting blood." (*Id.*, ¶ 90).

Mr. Lewis began yelling and banging on the back windows of the police vehicle, damaging the protective barriers that covered the window (*Id.*, ¶ 92). Mr. Lewis's family members shouted for him to stop as he continued to bang on the protective barrier on the police vehicle's windows (*Id.*, ¶ 93).

Officer Worley asked Officer Jones if he was okay, while Officer Jones inspected himself for injuries (*Id.*, ¶ 94). Officer Worley stated that Mr. Lewis "spit blood on me" to which Officer Jones responded, "he spit it on me, too." (*Id.*, ¶ 95).

Mr. Lewis continued yelling and banging on the back window in Officer Jones's patrol vehicle (*Id.*, ¶ 96).

Sergeant Mudgett informed the officers that Officer Newton suffered a scrape on his arm (*Id.*, ¶ 97). Officer Worley informed Sergeant Mudgett that Mr. Lewis grabbed his taser and tried to pull it out of his hand (*Id.*, ¶ 98).

As Mr. Lewis was banging on the windows and screaming, Mr. Ware yelled at Mr. Lewis, "Stop boy!" (*Id.*, ¶ 99). Mr. Lewis's female family members told him to "calm down bro," and to "calm down boy." (*Id.*, ¶ 100). One of Mr. Lewis's female family members told Mr. Lewis, "You're only doing it to yourself. Why don't you just calm down?" (*Id.*, ¶ 101). Mr. Lewis's family informed Officer Worley that Mr. Lewis regularly takes medicine because he is bi-polar, and Mr. Lewis had "been running since this morning." (*Id.*, ¶ 102). Officer Worley then informed Mr. Lewis's family that medical was coming to evaluate Mr. Lewis (*Id.*, ¶ 103). Mr. Lewis again began to yell and bang on the back windows of the patrol vehicle, and Mr. Lewis's family yelled at him, "Luther, calm down; just chill out, now; chill out; you're alright; and won't you chill out?" (*Id.*, ¶ 104).

Officer Jones informed Officer Worley that the officers were going to take Mr. Lewis to the hospital for treatment (*Id.*, ¶ 105). Sergeant Burningham recommended that Officer Jones, Officer Pfrenger,[2] Officer Worley, and he transport Mr. Lewis to Baptist Health in Conway, Arkansas, for treatment because of Mr. Lewis's belligerent state (*Id.*, ¶ 106). Because of the plan to take Mr. Lewis to the hospital, Officer Worley canceled the MEMS ambulance response (*Id.*, ¶ 107). At the hospital, Mr. Lewis refused to allow medical staff to treat his injuries (*Id.*, ¶ 108). Mr. Lewis alleges that he received a burn mark from the taser and injuries to his head, shoulders, and leg (*Id.*). Mr. Lewis remained belligerent, largely combative, verbally aggressive, and noncompliant while at the hospital (*Id.*, ¶ 109). At one point, Mr. Lewis refused to speak to anyone but Officer Jones (*Id.*). The hospital ultimately discharged Mr. Lewis for refusing treatment (*Id.*). Officer Jones then transported Mr. Lewis to the jail (*Id.*, ¶ 110).

---

[2]  Officer Pfrenger is not a defendant in this lawsuit.

### D.   Mr. Lewis's Criminal Charges

The State charged Mr. Lewis with battery II, aggravated assault upon a certified law enforcement officer, resisting arrest, criminal mischief I, fleeing – on foot, public intoxication, and disorderly conduct (*Id.*, ¶ 111).  Mr. Lewis accepted a plea agreement in another state criminal case in which, as a condition of the agreement, the court *nolle prossed* his criminal charges from this incident (*Id.*, ¶ 112).

### E.   Conway Police Department Policies

The Conway Police Department maintains a conducted electrical weapon policy that does not require its officers to act unconstitutionally (*Id.*, ¶ 113).  The policy states:

> The device shall never be used on a handcuffed person to force compliance unless the subject poses a threat to the officer or himself/herself through physical conduct or active resistance that cannot otherwise be controlled.

(*Id.*, ¶ 114).

The Conway Police Department maintains a use of force policy that does not require its officers to act unconstitutionally (*Id.*, ¶ 115).  The policy provides:

> Officers will use the minimum amount of force necessary and reasonable to control a situation, effect an arrest, overcome resistance to arrest, or defend themselves from harm.

> When the use of force is necessary, the degree of force employed should be in direct relationship to the amount of resistance met.  No officer will use unreasonable or excessive force toward any person.

> Force will never be used in punitive manner and officers will escalate or de-escalate levels of force as the offender(s) escalates or de-escalates resistance.  Officers must be able to justify, by articulation of the totality of the circumstances, why they used the amount and level of force they used.

> The force continuum used by officers of the Department will be progressive in nature whenever needed.  The Use of Force Continuum for the Conway Police Department will be as follows:

> **Level I**        Officer Presence

| | |
|---|---|
| **Level II** | Verbal Commands |
| **Level III** | Empty Hand Control/OC Spray/TASER® |
| **Level IV** | Impact Weapons/Less Lethal Munitions/K-9 |
| **Level V** | Deadly Force |

(*Id.*, ¶ 116).

All officers "are required to carry a department approved Conducted Electrical Weapon (CEW)." (*Id.*, ¶ 117).

The Conway Police Department maintains a policy that requires officers to provide medical treatment to suspects who are subjected to less than lethal force. The policy provides in relevant part:

> Suspect(s) who are struck by less lethal munitions will be transported to the nearest medical facility for examination. Any suspect who is transported to a medical facility will be accompanied by another officer.
>
> When any force is used the officer shall attempt to determine if any injuries have occurred as soon as practicable.
>
> If a suspect is obviously injured, alleges injury or requests medical assistance when an officer has used force, the officer will immediately notify a supervisor.
>
> In these instances, officers will provide medical treatment for the suspect by requesting Emergency Medical Services (EMS).

(*Id.*, ¶ 118).

At the time of this incident, the Conway Police Department was testing body worn cameras (*Id.*, ¶ 119). For this reason, Officer Worley was the only officer who was wearing a body worn camera during the incident (*Id.*).

When Mr. Lewis was asked at his deposition whether he believed that the Conway Police Department policies were defective, Mr. Lewis stated, "I don't think the policies stated for them to . . . do that. I don't think the Conway Police Department trained them in that manner, for them to use that type of force against a suspect or a subject." (*Id.*, ¶ 120).

14

F.     **Police Officer Training**

Officer Worley attended and completed the police training academy at the Arkansas Law Enforcement Training Academy ("ALETA") on December 21, 2012, after undergoing over 478 hours of training (*Id*., ¶ 121).   Officer Worley became a certified law enforcement officer on October 10, 2014 (*Id*.).   Officer Worley was certified to carry a Taser on August 22, 2018 (*Id*.). As of the date of this incident, Officer Worley completed 1,371 hours of training certified through the Commission on Law Enforcement Standards and Training ("CLEST") (*Id*.).

Officer Jones attended and completed the police training academy at the Black River Technical College, after undergoing over 580 hours of training (*Id*., ¶ 122).   Officer Jones received his law enforcement certification on October 23, 2007 (*Id*.).   As of the date of this incident, Officer Jones completed 1,177 hours of training certified through CLEST (*Id*.).

Officer Foreman attended and completed the police training academy at the Central Arkansas Police Academy on May 13, 2016, after undergoing 716 hours of training (*Id*., ¶ 123). Officer Foreman received his law enforcement certification on September 6, 2018 (*Id*.).   As of the date of this incident, Officer Foreman completed 842 hours of training certified through CLEST (*Id*.).

Officer Newton attended and completed the police training academy at the Central Arkansas Police Academy on May 13, 2016, after undergoing 716 hours of training (*Id*., ¶ 124). Officer Newton received his law enforcement certification on May 7, 2018 (*Id*.).   As of the date of this incident, Officer Newton completed 872 hours certified through CLEST (*Id*.).

Sergeant Burningham attended and completed the police training academy at the Arkansas Law Enforcement Training Academy on June 6, 2009, after undergoing 524 hours of training (*Id*., ¶ 125).   Sergeant Burningham received his law enforcement certification on May 10, 2010 (*Id*.).

As of the date of this incident, Sergeant Burningham completed 1,090 hours of training certified through CLEST (*Id*.).

Sergeant Mudgett attended and completed the police training academy at the Black River Technical College on April 9, 2004, after undergoing 776 hours of training (*Id*., ¶ 126). Sergeant Mudgett received his law enforcement certification on October 19, 2004. As of the date of this incident, Sergeant Mudgett completed 1,303 hours of training certified through CLEST (*Id*.).

## II.    Mr. Lewis's Official Capacity Claims – Defendants' Motion To Strike – Mr. Lewis's Motion To Withdraw Voluntarily Claims

Defendants argued in their reply to Mr. Lewis's response to defendants' motion for summary judgment that Mr. Lewis did not address in his response to the motion for summary judgment defendants' arguments as to why Mr. Lewis's official capacity claims fail, and thus Mr. Lewis's official capacity claims should be dismissed as a matter of law (Dkt. No. 81, at 7-8). After receiving defendants' reply, on September 21, 2023, Mr. Lewis filed a response to defendants' official capacity claim (Dkt. No. 83). Defendants moved to strike Mr. Lewis's September 21, 2023, response to defendants' official capacity claim (Dkt. No. 84). Defendants asserted that Mr. Lewis had until September 14, 2023, to file a response to defendants' motion for summary judgment pursuant to Local Rule 7.2(b) of the United States District Court for the Eastern and Western Districts of Arkansas, and Mr. Lewis's September 21, 2023, response was untimely (*Id*., ¶ 2). Additionally, defendants maintained that Mr. Lewis's argument that the officers violated City policy is not sufficient to establish City liability (*Id*., ¶ 3). Mr. Lewis filed a response to defendants' motion to strike his response to defendants' official capacity claim (Dkt. No. 88). In his response, Mr. Lewis asks the Court to deny defendants' motion to strike his response to defendants' official capacity claim because he is not trained in the law and is doing his best to litigate his case with the help of other inmates (*Id*.).

On January 8, 2024, Mr. Lewis filed a motion to withdraw voluntarily claims, and defendants filed a response (Dkt. Nos. 91, 93).  In the motion to withdraw voluntarily claims, Mr. Lewis seeks to withdraw his official capacity claims against all defendants (*Id*., at 1).  Mr. Lewis states that, due to defendants' argument in section IV of their brief, he wishes to withdraw his official capacity claims against all defendants (*Id*., ¶ 4).  Mr. Lewis also states that voluntary dismissal of his official capacity claims, prior to the Court ruling on defendants' motion for summary judgment, should not count as a strike pursuant to 28 U.S.C. § 1915(g).  Defendants respond that they do not oppose the motion (Dkt. No. 93).  For good cause shown, the Court grants Mr. Lewis's motion to withdraw voluntarily official capacity claims and denies as moot defendants' motion to strike (Dkt. Nos. 91, 84).  The Court dismisses without prejudice Mr. Lewis's official capacity claims against all defendants.

### III.    Mr. Lewis's Motion To Correct

Before the Court is Mr. Lewis's motion to correct in which Mr. Lewis argues that defendants should not be entitled to summary judgment because they reference Fourth Amendment law in their brief in support after this Court screened the complaint and concluded that Mr. Lewis had stated claims of excessive force and failure to intervene, which Mr. Lewis assumes are Eighth Amendment claims (Dkt. No. 92).  Defendants filed a response to Mr. Lewis's motion to correct defendants' brief in support in which they state that, if Mr. Lewis intends to abandon his Fourth Amendment excessive force claims, defendants have no objection (Dkt. No. 94, ¶ 2).  Mr. Lewis filed an objection to defendants' response to plaintiff's motion to correct defendants' brief in support in which Mr. Lewis states that he did not intend to withdraw his Fourth Amendment claims (Dkt. No. 97, ¶ 3).

In making his motion to correct defendants' brief, Mr. Lewis points to the Court's screening Order, which determined that Mr. Lewis had stated claims of excessive force and failure to intervene (Dkt. No. 92, at 1).  The Court's screening Order acknowledges that Mr. Lewis adequately set forth claims for excessive force and failure to protect, but the Court did not set forth the standard that applies to Mr. Lewis's claims given that all of the events described in the complaint occurred prior to Mr. Lewis's conviction.  *See Graham v. Connor*, 490 U.S. 386, 388 (1989) (determining that the Fourth Amendment's objective reasonableness standard applies when the claim is that an officer used excessive force while "making an arrest, investigatory stop, or other 'seizure.'"); *Davis v. White*, 794 F.3d 1008, 1011–12 (8th Cir. 2015) (concluding that the Fourth Amendment objective reasonableness standard applies to claims of excessive force brought by detainees in custody prior to conviction); *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009) (explaining that the Fourth Amendment applies to officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer during an arrest or detention prior to conviction).  The Court understands, based on Mr. Lewis's objection to defendants' response to his motion to correct defendants' brief in support, that Mr. Lewis did not intend in his motion to correct defendants' brief to withdraw his Fourth Amendment claims against defendants (Dkt. No. 92, ¶¶ 2-3).  Accordingly, the Court denies Mr. Lewis's motion to correct defendants' brief, and the Court will consider Mr. Lewis's excessive force and failure to protect claims under the Fourth Amendment (Dkt. No. 92).

## IV.    Defendants' Motion For Summary Judgment

### A.    Legal Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact to be decided at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UnitedHealth Group Inc. v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Federal Rule of Civil Procedure 56 and noting that summary judgment is proper if there is no genuine issue of material fact for trial). Under such circumstances, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322. "In ruling on a motion for summary judgment, '[t]he district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'" *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923-24 (8th Cir. 2004) (internal citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Regional Medical Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B.      Analysis

#### 1.      Qualified Immunity

"Qualified immunity shields officers from civil damage liability for discretionary acts when '[their] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Brossart v. Janke*, 859 F.3d 616, 624 (8th Cir. 2017) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (quotations omitted)). "To avoid pre-trial dismissal, a plaintiff must show both that (1) the facts demonstrate that the plaintiff suffered a violation of a constitutional or statutory right and (2) the right was clearly established at the time of the defendant's alleged misconduct." *Brossart*, 859 F.3d at 624 (citations omitted).

Mr. Lewis claims that Officers Worley, Jones, Foreman, and Newton used excessive force when they attempted to detain, arrest, and subdue Mr. Lewis on August 22, 2018.  Specifically, Mr. Lewis asserts that Officer Worley used excessive force when he tased Mr. Lewis once in drive-stun mode while he was handcuffed (Dkt. Nos. 2, 3, 33, 43, 80, at 7).  Mr. Lewis contends that Officer Jones used excessive force by striking him multiple times with a closed fist after he was tased and while he was handcuffed (Dkt. Nos. 2, 3, 33, 43, 80, at 5).  Mr. Lewis asserts that Officer Foreman used excessive force when he grabbed his left arm and attempted to "snatch" him out of his vehicle (Dkt. Nos. 2, 3, 33, 43, 80, at 1-2).  Mr. Lewis asserts that Officer Newton used excessive force by pulling his taser on him while Officer Foreman was grabbing his arm and trying to "snatch" him out of his vehicle and by having his elbow on the back of his neck and his right forearm on the left side of his face where his head was pinned down and his face was embedded in gravel while Officer Foreman was attempting to handcuff Mr. Lewis (Dkt. Nos. 2, 3, 33, 43, 80, at 4).

The Fourth Amendment's objective reasonableness standard governs a claim that an officer used excessive force "in the course of making an arrest, investigatory stop, or other 'seizure.'" *Graham v. Connor*, 490 U.S. 386, 388 (1989).  A court applies the Fourth Amendment objective reasonableness standard to claims of excessive force brought by detainees in custody.  *See Davis v. White*, 794 F.3d 1008, 1011-12 (8th Cir. 2015).  A court's analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake," as well as "careful attention to the facts and circumstances of each particular case."  *Graham*, 490 U.S. at 396 (quotations omitted); *see County of Los Angeles v. Mendez*, 581 U.S. 420, 427-28 (2017).  "'Reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396 (citations omitted).  A court may consider factors such as:  "the severity of the crime; whether the suspect poses a threat of harm to others; whether the suspect is resisting arrest; and other factors, such as whether the situation is 'tense, uncertain, and rapidly evolving,' which would force an officer to make 'split-second judgments' about how much force is necessary."  *Coker v. Arkansas State Police*, 734 F.3d 838, 842–43 (8th Cir. 2013) (quoting *McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011)).  When evaluating whether summary judgment is proper, the Court must view all facts in the non-moving party's favor.  Whether the force used was constitutionally excessive is a matter of law.  *Davis*, 794 F.3d at 1013.

Defendants assert that the use of force on Mr. Lewis did not violate the United States Constitution or, in the alternative, that it was not clearly established that their actions were an excessive use of force in violation of a constitutional right, and they are entitled to qualified immunity (Dkt. No. 77, at 16-17).  Mr. Lewis argues that the individual officers' use of force was

unreasonable and violated Conway Police Department policy, procedure, and state laws (Dkt. No. 80).

This Court need not determine whether any individual defendants' conduct violated Conway Police Department policy and procedure or any unidentified Arkansas law.  Under § 1983, the issue in this case is whether the individual defendants violated the Constitution or federal law, not whether the individual defendants violated Conway Police Department policy because "[c]onduct by a government official that violates some state statutory or administrative provision is not necessarily constitutionally unreasonable."  *See Cole v. Bone*, 993 F.2d 1328, 1334 (8th Cir. 1993) (citing *Davis v. Scherer,* 468 U.S. 183, 193–94, (1984); *Cf. Edwards v. Baer,* 863 F.2d 606, 608 (8th Cir. 1988) (citing *Scherer,* 468 U.S. at 194) (stating that police department guidelines do not create a constitutional right); *McClinton v. Ark. Dep't of Corr.*, 166 Fed. Appx. 260 (citing *Kennedy v. Blankenship*, 100 F.3d 640, 642 (8th Cir. 1996) (failure to follow ADC policy does not state a claim for relief under 42 U.S.C. § 1983)).  "State legislatures and government agencies are free to hold government officials to higher standards than the Constitution requires."  *Id*. (citing *Smith v. Freland,* 954 F.2d 343, 347 (6th Cir.), *cert. denied,* 504 U.S. 915 (1992)).  Accordingly, the Court will not discuss Mr. Lewis's claims that individual defendants violated Conway Police Department policy and unidentified Arkansas laws but will discuss whether any of the defendants used excessive force in violation of the United States Constitution and whether the individual defendants are entitled to qualified immunity.

a.      **Officer Worley**

Mr. Lewis asserts that Officer Worley used excessive force when he tased Mr. Lewis once in drive-stun mode while he was handcuffed in the back seat of the patrol vehicle (Dkt. No. 80, at 7).  Mr. Lewis disputes that he was spitting blood on officers or kicking them prior to Officer

Worley using his taser (*Id.*).  Mr. Lewis contends that Officer Worley violated Conway Police department policy by utilizing his taser.  Even assuming the facts in the light most favorable to Mr. Lewis, Officer Worley's body camera video shows that, prior to Officer Worley using his taser, Mr. Lewis was noncompliant with Officer Worley's commands to get in the patrol vehicle and was actively making it difficult for officers to seat him properly in the patrol vehicle to transport Mr. Lewis to jail (Dkt. No. 76-1, Ex. 8).

In *Franklin v. Franklin County, Arkansas*, 956 F.3d 1060, 1062 (8th Cir. 2020), the Eighth Circuit Court of Appeals addressed a claim of excessive force resulting from the use of a taser up to eight times in a situation where the arrestee was being noncompliant and defiant.  The Court determined that police officers did not violate the constitution and were entitled to qualified immunity.  *Franklin*, 956 F.3d at 1062.  The Court pointed to other cases where it had held that an officer who tased a violent, defiant arrestee did not violate the Fourth Amendment.  *Franklin*, 956 F.3d at 1062 (citing *Brossart*, 859 F.3d at 622, 625 (where court determined that an officer who tased a violent, defiant arrestee at least five times did not violate the Fourth Amendment); *Zubrod v. Hoch*, 907 F.3d 568, 572, 580 (8th Cir. 2018) (where court determined that there was no violation of Fourth Amendment in case where officers tased violent, resisting arrestee up to ten times)).  In *Franklin*, the Court noted that the scene "was a tumultuous one involving seemingly aggressive and noncompliant behavior, circumstances which we have previously held rendered officers' uses of tasers reasonable."  *Franklin*, 956 F.3d at 1062 (citing *Rudley v. Little Rock Police Dep't*, 935 F.3d 651, 654 (8th Cir. 2019)).  The Eighth Circuit determined that "[t]he fact that Franklin was tased three times in drive-stun mode while in handcuffs" did not affect the result because "Franklin continued to resist the officers while he was in handcuffs" and courts have "allowed the use of tasers on detainees in handcuffs in appropriate circumstances."  *Franklin*, 956

F.3d at 1062 (citing *e.g.*, *LaCross v. City of Duluth*, 713 F.3d 1155, 1156–57 & n.3 (8th Cir. 2013)). The Court noted that a person in handcuffs can still present a danger to officers. *Franklin*, 956 F.3d at 1063 (citing *United States v. Pope*, 910 F.3d 413, 417 (8th Cir. 2018)). The Court also observed that "a tasing in drive-stun mode 'only causes discomfort and does not incapacitate the subject,' suggesting that effects of such force are de minimis." *Franklin*, 956 F.3d at 1063 (quoting *Brossart*, 859 F.3d at 626)).

Here, the body camera video of the incident shows that Officer Worley ordered Mr. Lewis three times to get into the patrol vehicle and that Mr. Lewis did not comply but remained seated with his legs hanging out of the door of the vehicle. After Officer Worley tased Mr. Lewis once in drive-stun mode on his ribcage, Officer Worley again ordered Mr. Lewis to get in the patrol vehicle, and Mr. Lewis again refused and continued to resist officers' attempts to place him in the patrol vehicle to be transported to the jail. Mr. Lewis's ability to present danger despite being handcuffed is evidenced by the fact that, during their encounters with Mr. Lewis while he was handcuffed, Sergeant Burningham sustained an injury to his cheek and Sergeant Mudgett received an injury to his head. Officer Worley's use of force to attempt to get Mr. Lewis to comply when Mr. Lewis continually ignored commands was objectively reasonable within the meaning of the Fourth Amendment. *See Franklin*, 956 F.3d at 1063; *Brossart*, 859 F.3d at 625.

Further, Officer Worley is entitled to qualified immunity because, even if Officer Worley's one time use of his taser in drive-stun mode on Mr. Lewis's rib cage was unreasonable, it did not violate clearly established law. For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. at 79 (quotations omitted). The Eighth Circuit's prior cases have clearly established that "use of [a] taser on a nonfleeing, nonviolent suspected misdemeanant [is] unreasonable." *Shekleton*, 677 F.3d 361,

367 (8th Cir. 2012) (citing *Brown v. City of Golden Valley*, 574 F.3d 491, 499-500 (8th Cir. 2009)). Here, however, Mr. Lewis refused to cooperate with officers attempting to investigate a possible criminal violation, physically resisted a lawful arrest, and ignored repeated commands to get in the patrol vehicle or be tased. Use of force requires a particularized *Graham v. Connor* Fourth Amendment analysis, and the Supreme Court has instructed that, in the qualified immunity context, "Graham do[es] not by [itself] create clearly established law outside 'an obvious case.'" *Pauly*, 580 U.S. at 80. Officer Worley's one time use of the taser against a potentially violent, defiant arrestee was not an obvious case. For example, in *De Boise v. Taser Int'l, Inc*., 760 F.3d 892 (8th Cir. 2014), *cert. denied*, 575 U.S. 1025 (2015), the Eighth Circuit affirmed the grant of qualified immunity to officers who used multiple tasings that resulted in the death of a violent, delusional schizophrenic person who had threatened officers attempting to handcuff him and continued to struggle with officers after eight tasings. The Eighth Circuit explained that "no reasonable officer, observing De Boise's behavior, would have understood the actions taken to be so disproportionate and unnecessary as to amount to a [constitutional] violation." *Id*. at 897-98.

In *Brossart*, the Eighth Circuit Court of Appeals affirmed the district court's grant of qualified immunity to officers who tased brothers Rodney and Thomas Brossart. *Brossart v. Janke*, 859 F.3d 616, 626–27 (2017). The Eighth Circuit concluded that Deputy Braathen's conduct did not violate clearly established law because Rodney Brossart "refused to cooperate with officers attempting to investigate a possible criminal violation, made threats of violence sufficient to support conviction of a terrorizing felony, then physically resisted a lawful arrest, ignoring repeated commands to lie down or be tased." *Id*. at 626. Deputy Braathen's conduct also did not violate clearly established law with respect to Thomas Brossart, who the Court found had also participated in the armed standoff, resisted his lawful arrest, refused to walk to the patrol car,

and then refused to move over in the squad car after being ordered to do so. *Id*. Thomas Brossart was handcuffed and detained in the back seat of a squad car at the time that Deputy Braathen tased him in drive-stun mode. *Id*. at 626.

Officer Worley is entitled to qualified immunity because Officer Worley's one time use of his taser in drive-stun mode on Mr. Lewis's rib cage did not violate clearly established law. The undisputed facts establish that Mr. Lewis refused to cooperate with officers attempting to investigate, resisted arrest, and refused to get in the patrol vehicle when instructed to do so by Officer Worley. After Officer Worley tased Mr. Lewis once in drive-stun mode on his ribcage, Officer Worley again ordered Mr. Lewis to get in the vehicle, and Mr. Lewis again refused to get in the patrol vehicle and continued to resist officers' attempts to place him in the patrol vehicle to be transported properly. *See Brossart*, 859 F.3d at 625. The Court grants Officer Worley's motion for qualified immunity on Mr. Lewis's excessive force claim.

### b.      Officer Jones

Mr. Lewis maintains that officer Jones used excessive force in violation of Conway Police Department policy and procedure and state law (Dkt. No. 80, at 5). Specifically, Mr. Lewis asserts that Officer Jones struck him multiple times with a closed fist after he was tased and while he was handcuffed causing him to sustain injuries to his mouth and face (*Id*.). Mr. Lewis contends that Officer Jones's actions violated the Conway Police Department policies regarding conduct of electrical weapon and use of force continuum (*Id*., at 5-6).

Defendants argue that Officer Jones's use of what they call "hard hands" to gain control and compliance from Mr. Lewis was objectively reasonable under the circumstances (Dkt. No. 77, at 9–12). Defendants point to *Winters v. Adams*, 254 F.3d 758 (8th Cir. 2001), where Officer Adams hit Mr. Winters in the eye with a closed fist while attempting to remove him from a car.

*Id.* at 762.  The Eighth Circuit determined that, because Mr. Winters behaved erratically before and after force was used by Officer Adams, Officer Adams's "single blow" to Mr. Winters's eye was objectively reasonable in the light of the surrounding circumstances.  *Id.* at 765.

Here, after Mr. Lewis was tased once in drive-stun mode by Officer Worley, Officer Jones asserts that he saw Mr. Lewis reach for Officer Worley's taser.  Officer Jones began striking Mr. Lewis multiple times with a closed fist in order for Officer Worley to regain control of his taser.  According to Mr. Lewis, Officer Jones struck him in in the mouth and ribs.  Officer Jones stopped striking Mr. Lewis when Mr. Lewis surrendered the taser and when Officer Worley was able to turn the taser off and move away from Mr. Lewis's reach – approximately five seconds later according to Officer Worley's body camera video footage.  Mr. Lewis was still not in the patrol vehicle as commanded and continued to use his legs to prevent officers from placing him inside the vehicle.  Once officers were finally able to force Mr. Lewis's legs inside the patrol vehicle and shut the door, Mr. Lewis pushed himself through the open door on the driver's side of the vehicle and fell to the ground.  Even after Officer Jones struck Mr. Lewis, Mr. Lewis continued to prevent officers from placing him back in the patrol vehicle, and then, after he was placed in the patrol vehicle, Mr. Lewis continued to act in an erratic and violent manner in the back of the patrol vehicle.  Officers took Mr. Lewis to the hospital, but hospital employees discharged Mr. Lewis for refusing medical treatment.

Mr. Lewis asserts that he was only passively resistant.  This assertion is not borne out by the body camera video footage which is part of the summary judgment record (Dkt. No. 76, Ex. 8).  The body camera video shows that Mr. Lewis repeatedly refused to comply with commands to get into the patrol vehicle.  Further, the body camera video shows that Mr. Lewis actively took steps to defeat officers' attempts place him properly into the seat of the patrol vehicle so that he

could not be transported to the jail.  Mr. Lewis is shown hooking his legs around the legs of an officer, refusing to place his legs inside the vehicle, pushing himself out of the patrol vehicle, and hooking his legs on the door frame of the patrol vehicle.

Even viewing the facts in the light most favorable to Mr. Lewis, which the Court must at this stage in the proceeding, the Court determines that Officer Jones is entitled to qualified immunity on Mr. Lewis's claim of excessive force because Officer Jones's use of his closed fist to allow Officer Worley to regain control of his taser and to permit Officer Jones to attempt to gain compliance from Mr. Lewis was objectively reasonable under the circumstances.  *See Winters*, 254 F.3d at 765.

Further, Mr. Lewis has not established that the law was clearly established that, in circumstances such as these, Officer Jones's use of his closed fist violated the Constitution.  *See Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) ("Although the defendant bears the burden of proof for this affirmative defense [of qualified immunity], the plaintiff must demonstrate that the law was clearly established.").

In *Smith v. City of Minneapolis*, 754 F.3d 541, 547 (8th Cir. 2014), an officer attempted to effectuate an arrest by ordering a large, potentially armed suspect to the ground "who was suspected of domestic abuse and [was] making threats with a gun.  The man refused to comply with the officer's orders."  To get the suspect to the ground and place handcuffs on him to protect the police and the public, a first officer approached the suspect and attempted to subdue him with a hit and a kick, but the officer did not use deadly force.  *Id*.  In a second encounter with Mr. Smith, officers tased Mr. Smith eight times for 40 seconds or more; an officer applied six knee strikes to Mr. Smith's right side and also attempted to apply a neck restraint to the left side of Mr. Smith's neck; an officer smashed the butt of his rifle into the center of Mr. Smith's back and punched Mr.

Smith on the right side of his face two to three times; an officer, in addition to tasing Mr. Smith at least three times, hit Mr. Smith three times in the right side of his head while he was lying across Mr. Smith's body; meanwhile an officer assisted in keeping Mr. Smith under the load of the other officers' bodies.  The Eighth Circuit Court of Appeals found that Mr. Smith had not cited any clear case law that would have put the officer on notice that such actions would violate Mr. Smith's constitutional right and granted qualified immunity.  *Id*. at 548-49.

The undisputed facts in the record at this stage in the proceedings establish that Mr. Lewis had been in a physical altercation with Mr. Rosbia prior to encountering officers, was upset as a result of that encounter, refused to cooperate with officers' investigation, resisted arrest, and refused to get in the patrol vehicle after being ordered multiple times to do so by Officer Worley and other officers.  After Officer Worley tased Mr. Lewis once in drive-stun mode on his ribcage, Mr. Lewis turned and reached for Officer Worley's active taser putting himself, Officer Jones, Officer Worley, and other officers and individuals at the scene at risk.  Officer Jones struck Mr. Lewis with his closed fist until Officer Worley regained control of his taser.  Officer Worley again ordered Mr. Lewis to get in the vehicle, and Mr. Lewis again refused and continued to resist officers' attempts to place him in the patrol vehicle to be transported properly.  Even after being placed in the patrol vehicle, Mr. Lewis continued to act erratically, yelling and banging on the back windows of the police vehicle.

After carefully reviewing the record, the Court concludes that, under the circumstances encountered by Officer Jones, a reasonable officer could have believed that the use of a closed fist was not excessive or in violation of the clearly established law requiring an objectively reasonable response.  Officer Jones is thus entitled to qualified immunity.  *Smith*, 754 F.3d at 548-49.

### c.    Officer Newton

Mr. Lewis claims that Officer Newton used excessive force that was unreasonable and violated Conway Police department policy and procedure and state laws (Dkt. No. 80, at 3–4).  Mr. Lewis asserts that he was not placed under arrest and officers had no reason to grab his arm or touch him to inform him of the outcome of an investigation (*Id*., at 3).[3]  Specifically, Mr. Lewis claims that Officer Newton "grabbed [his] right arm where [he] suffered scrapes and bruises to [his] left leg, shoulder, head, and side of [his] face." (Dkt. No. 3, at 1).  Mr. Lewis asserts that Officer Newton had his elbow on the back of his neck and his right forearm on the left side of his face where his head was pinned down in the gravel (Dkt. No. 80, at 4).  Mr. Lewis also claims that Officer Newton pulled his taser on him and turned the taser on knowing that he did not pose a threat but was only "passively resisting." (Dkt. No. 80, at 3).  Mr. Lewis does not assert that Officer Newton used the taser but that he violated the C.E.W. deployment policy and the use of force continuum revised policy.

Officers may lawfully order a driver of a vehicle to exit the vehicle.  *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977).  Further, "Fourth Amendment jurisprudence has long recognized [however] that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1007 (8th Cir. 2003) (quoting *Graham v. Connor,* 490 U.S. 386,

---

[3]  Mr. Lewis raises for the first time in this response a claim that officers did not read him his Miranda rights.  Mr. Lewis did not raise this claim in his complaint, and he cannot raise it for the first time here (Dkt. Nos. 2, 3, 33, 72).  *Bragg v. Husqvarna Forestry Prod., N.A. Inc.*, Case No. 4:20-cv-4054, 2021 WL 2346012, at *3 (W.D. Ark. June 8, 2021) ("A claim cannot be raised for the first time while opposing summary judgment, and the correct manner for a party to assert a new claim is to seek to amend its complaint.") (citing *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

396 (1989)).  "Handcuffing inevitably involves some use of force."  *Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006).

At the stage in the timeline when Mr. Lewis asserts that Officer Newton used excessive force, Mr. Lewis had resisted officers' attempts to conduct an investigation, refused to exit his vehicle when asked, and become evasive by trying to avoid the officers.  Officer Newton drew his taser in an effort to get Mr. Lewis to comply with Officer Foreman's commands to exit his vehicle.  Mr. Lewis does not assert that Officer Newton used his taser, but instead Mr. Lewis asserts that Officer Newton violated Conway Police Department policy by drawing his taser.

Later, after Mr. Lewis voluntarily exited his vehicle and Officer Foreman informed Mr. Lewis that he was under arrest for disorderly conduct, Mr. Lewis was resisting arrest when he was pinned down by Officer Newton because Mr. Lewis was moving his arms to avoid being handcuffed by Officer Foreman.  It was objectively reasonable for Officer Newton, under the circumstances, to attempt to gain control over Mr. Lewis while he and Officer Foreman attempted to place Mr. Lewis in handcuffs.  Accordingly, the Court concludes based on the record evidence before it construed in the light most favorable to Mr. Lewis that Officer Newton is entitled to summary judgment because he did not use excessive force against Mr. Lewis.

Further, Mr. Lewis has failed to meet his burden of proving that the law at the time of the incident was clearly established that a reasonable officer in Officer Newton's position would know that his conduct violated the law.  At the time of this incident, the law was clearly established that officers could use force in similar circumstances where an individual was refusing to comply with reasonable orders.  In *Wertish v. Krueger*, 433 F.3d 1062, 1066 (8th Cir. 2006), for example, the United States Court of Appeals for the Eighth Circuit determined that it was reasonable for an officer to pull Wertish, who had failed to follow multiple orders, out of the truck and take him

down to the ground to handcuff him.  *See also Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) (holding no constitutional violation in using a spin take-down or taser where an arrestee was "continuing to lay on his hands and refusing to comply with instructions" because officers "could have interpreted" this "as resistance," "regardless of whether [the man] actually intended to resist").

After carefully reviewing the record, the Court concludes that, under the circumstances encountered by Officer Newton, a reasonable officer could have believed that the use of force was not excessive or in violation of the clearly established law requiring an objectively reasonable response.  Officer Newton is thus entitled to qualified immunity.  *Wertish*, 433 F.3d at 1067.

### d.      Officer Foreman

Mr. Lewis also claims that Officer Foreman used excessive force when he grabbed his left arm in an attempt to "snatch" him out of his vehicle (Dkt. No. 3, at 1).  Mr. Lewis later exited the vehicle voluntarily.  It is unclear whether Mr. Lewis claims that this use of force by Officer Foreman resulted in any injury.

Here, Officer Foreman was aware that Mr. Lewis had been in a physical altercation with Mr. Rosbia before fleeing in his vehicle and that his mother had described Mr. Lewis as "irate." Officer Foreman ordered Mr. Lewis to exit his vehicle multiple times, but Mr. Lewis refused Officer Foreman's lawful commands.  Officer Foreman grabbed Mr. Lewis's arm in an attempt to get Mr. Lewis to exit his vehicle in compliance with his commands.  It was reasonable under the circumstances, where Mr. Lewis was not complying with orders to get out of his vehicle, for Officer Foreman to grab Mr. Lewis's arm in an attempt to gain compliance.  *Wertish*, 433 F.3d at 1066.

Further, Mr. Lewis has failed to meet his burden of proving that the law at the time of the incident was clearly established that a reasonable officer in Officer Foreman's position would know that his conduct violated the law.  To the contrary, the law at the time of this incident was clearly established that a reasonable officer in Officer Foreman's position could use some degree of physical force to make an arrest and handcuff an arrestee.  *Crumley*, 324 F.3d at 1007 (quoting *Graham v. Connor,* 490 U.S. at 396); *Wertish*, 433 F.3d at 1067.

After carefully reviewing the record, the Court concludes that, under the circumstances encountered by Officer Foreman, a reasonable officer could have believed that the use of force was not excessive or in violation of the clearly established law requiring an objectively reasonable response.  Officer Foreman is thus entitled to qualified immunity.  *Wertish*, 433 F.3d at 1067.

### 2.        Failure To Intervene

Mr. Lewis asserts that Sergeants Mudgett and Burningham, and Officers Foreman and Newton failed to intervene to prevent the use of excessive force.

"[A] state actor may be liable for an unreasonable seizure under the Fourth Amendment if he fails to intervene to prevent the unconstitutional use of excessive force by another official." *Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009).  Before the Court may impose liability for failing to intervene, however, Mr. Lewis must show that "the officer [was] aware of the abuse and the duration of the episode [was] sufficient to permit an inference of tacit collaboration." *Grider v. Bowling*, 785 F.3d 1248, 1253 (8th Cir. 2015).

Mr. Lewis's failure to intervene claims fail because the Court has determined that the force employed by Officers Worley, Jones, Newton, and Foreman was objectively reasonable given the circumstances.  It follows that Sergeants Mudgett and Burningham and Officers Foreman and Newton were not obligated to intervene to protect Mr. Lewis from reasonable force.

### V.     Mr. Lewis's Motion Seeking Permission Of Court To Amend The Complaint

Mr. Lewis files a motion seeking permission of the Court to amend the complaint pursuant to Federal Rule of Civil Procedure 15(a) (Dkt. No. 95).  Mr. Lewis states that in his complaint filed on March 1, 2020, he only sought punitive damages, and, due to his ignorance of the law, he failed to seek compensatory damages for his injuries (*Id*., at 1).  Mr. Lewis asserts that he has good cause to amend under Federal Rule of Civil Procedure 16(b)(4) because he prepared the complaint without the help of a lawyer and only recently became aware that he was entitled to compensatory damages (*Id*., at 5, 7).  Mr. Lewis argues that, if the Court grants his motion to amend, defendants' motion for summary judgment would be moot (*Id*., at 7).

Because Mr. Lewis filed his motion seeking permission to amend his complaint after the expiration of the deadline for amending pleadings set forth in the Court's Final Scheduling Order and after defendants' motion for summary judgment became ripe for decision by the Court, Rule 16(b) of the Federal Rules of Civil Procedure applies to guide the "modification of pretrial scheduling order[] . . . ."  *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715 (8th Cir. 2008).  "This schedule 'may be modified *only for good cause* and with the judge's consent.'"  *Id.* (quoting Fed. R. Civ. P. 16(b)(4)).  The Eighth Circuit has made clear that "[t]he interplay between Rule 15(a) and Rule 16(b) is settled in this circuit."  *Id.* at 716.  In *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 497 (8th Cir. 2008), the Eighth Circuit stated that, "[i]f a party files for leave to amend outside of the court's scheduling order, the party *must* show cause to modify the schedule."  In *Sherman*, the court stated that *Popoalii*'s holding regarding the Rule 16(b) standard was reached "in the context of a discussion of the Rule 15 amendment standard, unmistakably concluding that Rule 16(b)'s good-cause standard governs when a party seeks leave to amend a pleading outside of the time period established by a scheduling order, not the more liberal standard of Rule 15(a)."

*Sherman*, 532 F.3d at 716.  "When a party seeks to amend a pleading after the scheduling deadline for doing so, the application of Rule 16(b)'s good-cause standard is not optional.  To permit district courts to consider motions to amend pleadings under Rule 15(a) without regard to Rule 16(b) would render scheduling orders meaningless and effectively . . . read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure."  *Id.* (internal quotation omitted).  Finally, the Eighth Circuit cases "reviewing Rule 16(b) rulings focus in the first instance (and usually solely) on the diligence of the party who sought modification of the order."  *Id.* at 717.

Mr. Lewis's motion to amend his complaint and thus the scheduling order is denied as untimely.  Mr. Lewis filed his complaint on April 1, 2020, alleging only punitive damages (Dkt. No. 1).  On March 23, 2021, Mr. Lewis moved to amend his complaint "to add pain and suffering to my claim." (Dkt. No. 24).  On September 16, 2021, the Court granted the motion and directed Mr. Lewis to file an amended and supplemented complaint within 30 days from the date of the Court's Order (Dkt. No. 29).  Mr. Lewis did not file an amended and supplemented complaint, however, but filed another motion to amend complaint and a petition to supplement § 1983 (Dkt. Nos. 32, 33).  In the motion to amend complaint, Mr. Lewis stated that he wanted to keep his original complaint and not move forward with the amended complaint of pain and suffering (Dkt. No. 32).  In the petition to supplement § 1983, Mr. Lewis points out inconsistencies in the officers' narrative reports (Dkt. No. 33).  Defendants did not object to Mr. Lewis withdrawing his motion to amend complaint or his petition to supplement § 1983 (Dkt. No. 34).  On August 26, 2022, the Court granted Mr. Lewis's motion to amend complaint not to move forward with the amended complaint of pain and suffering and granted Mr. Lewis's petition to supplement § 1983 (Dkt. No. 43).  Defendants filed a motion for summary judgment on all of Mr. Lewis's claims on August 31, 2023 (Dkt. No. 76).

Given the facts set forth above, the Court cannot conclude that Mr. Lewis was not aware until January 2024 that he could seek compensation other than punitive damages for his injuries. Mr. Lewis indicated in March 2021 a desire to amend his complaint to add a request for pain and suffering to his complaint, but he did not follow through and file an amended complaint that sought such compensation.  Because the Court has determined that good cause does not exist for Mr. Lewis to amend to seek compensatory damages at this late date and because the Court has also determined that defendants' motion for summary judgment should be granted, the Court denies Mr. Lewis's motion seeking permission of the Court to amend the complaint pursuant to Federal Rule of Civil Procedure 15(a).

**VI.    Conclusion**

For the reasons set forth above, the Court grants Mr. Lewis's motion to voluntarily withdraw official capacity claims and denies as moot defendants' motion to strike (Dkt. Nos. 91, 84).  Mr. Lewis's official capacity claims against defendants are dismissed without prejudice.  The Court denies Mr. Lewis's motion to correct (Dkt. No. 92).  The Court grants the defendants' motion for summary judgment (Dkt. No. 76).  Mr. Lewis's individual capacity claims against defendants are dismissed with prejudice based on qualified immunity (Dkt. Nos. 2, 3, 33, 72).  The Court denies Mr. Lewis's motion seeking permission of the Court to amend the complaint (Dkt. No. 95).

So ordered this 29th day of March, 2024.

*Kristine G. Baker*

Kristine G. Baker
Chief United States District Judge